```
             IN THE UNITED STATES DISTRICT COURT
               FOR THE DISTRICT OF NEBRASKA
```

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | 4:06CR3102 |
| | ) | |
| v. | ) | |
| | ) | |
| ANDRANETTE FOSTER, and LATHON WIDER, | ) | REPORT, RECOMMENDATION, AND ORDER |
| | ) | |
| Defendants. | ) | |

The defendants have moved to suppress physical evidence and statements arising from the traffic stop of the vehicle they occupied while driving on Interstate 80 in Nebraska on June 2, 2006. See filings 38 and 43. Nebraska State Patrol Trooper Frederick initiated the traffic stop. The defendants claim:

- The traffic stop was illegal;

- Trooper Frederick stopped the vehicle because the defendants are African American;[1] and

- The defendants were unlawfully detained following the stop.

---

[1] There is no evidentiary showing to support a claim of selective enforcement in violation of the Fourteenth Amendment. Without at least a threshold showing, the defendants were not entitled to an evidentiary hearing on any alleged denial of Equal Protection in violation of the Fourteenth Amendment. See e.g. United States v. Armstrong, 517 U.S. 456 (1996); United States v. Perry, 152 F.3d 900, 903 (8th Cir. 1998); United States v. Kelley, 152 F.3d 881, 885 (8th Cir. 1998). An evidentiary hearing on the defendants' motions to suppress was conducted and no evidence in support of the Fourteenth Amendment claim was offered by either defendant. Accordingly, the Fourteenth Amendment claims will not be addressed in this report and recommendation and should be denied.

The defendants moved to suppress "all items of evidence which were seized, and particularly all items which were obtained in violation of the fourth, fifth, ninth, and fourteenth amendments to the Constitution of the United States." Filing 38, (Wider Motion) at p.2.  See also filing 43 (Foster Motion) at p.2.[2]

An evidentiary hearing was held on January 10, 2007.  At the close of the evidentiary hearing, the defendants clarified that they seek suppression of the evidence on the grounds previously indicated, but also as a violation of the *de minimis* intrusion requirement for canine sniffs conducted without reasonable suspicion.  Filing 64 (transcript) at p. 56.  The parties have filed their post-hearing briefs, and the motion is now fully submitted.

## FACTUAL FINDINGS

On June 2, 2006, at approximately 10:30 p.m., the defendants were traveling eastbound on Interstate 80 near Lincoln, Nebraska. Defendant Foster was driving a white Budget rental truck rented by Theresa Patman.  Defendant Wider, who was a front seat passenger at the time of the traffic stop, was listed as a driver on the truck rental agreement.  Defendant Foster was not listed as an authorized driver.  Ex. 3 (Budget rental agreement).

Trooper Frederick was on duty in the carrier enforcement office of the Waverly Eastbound Scale located at mile marker 415 on Interstate 80 in Cass County.  Among other duties, carrier enforcement officers are charged with ensuring that each truck instructed to exit and weigh complies with the posted signs.  The

---

[2]The defendants' briefs, and the evidence offered at the hearing, do not address any claims under the Fifth and Ninth Amendments.  Those claims are therefore deemed abandoned.

procedure used by carrier enforcement officers to determine which vehicles were required to exit varies according to traffic conditions, personnel on staff, and each vehicle's commercial classification.  This process has both electronic and manual components.  The electronic signs instructing drivers to exit can be activated by a scale in the roadbed, or the carrier enforcement officer can manually override the roadbed sensor to instruct all trucks, or a particular sub-class determined by weight, to exit.

The photograph of each truck required to exit is displayed on the video monitors within the carrier enforcement office. Troopers are then required to visually observe that the truck displayed has exited the interstate to enter the weigh station. All electronic signs were in proper working order when Trooper Frederick went on duty on June 6, 2006, and were manually set to "all trucks must exit."

The video monitoring system in the carrier enforcement office displayed a picture of defendants' Budget rental truck in one of the four quadrants of the display monitor.  The video monitor alerted Trooper Frederick that the rental truck was instructed to exit and weigh.  From his position inside the carrier enforcement office, Trooper Frederick watched the interstate to determine whether it exited as instructed. Instead, he observed the rental truck proceed eastbound on Interstate 80 without exiting at the weigh station.  Trooper Frederick entered his patrol car, pursued the rental truck, and initiated a traffic stop.

The traffic stop was initiated at approximately 10:34 p.m. The defendants pulled over immediately.   Trooper Frederick exited

his vehicle and approached the passenger side of the vehicle to speak with the defendants. Trooper Frederick advised the defendants that their vehicle was stopped for failing to exit at the weigh station. He requested defendant Foster's driver's license and the truck's lease agreement. Ex. 1 (Frederick videotape) at 22:34.

While Foster searched for her operator's license, Trooper Frederick asked Wider about the origin of their trip. Wider responded that they were traveling from Denver to Omaha, Nebraska. Still seated in the rental truck, Foster informed Trooper Frederick that she was unable to find her driver's license. Trooper Frederick asked Foster to step out of the vehicle and be seated in the passenger side front seat of the patrol car. Foster complied with this request. Wider remained seated in the front passenger seat of the rental truck. Ex. 1 (Frederick videotape) at 22:34.

Inside the patrol vehicle, defendant Foster stated she had a valid Wisconsin license and her name was Andranette Carter. Trooper Frederick contacted dispatch to determine if Andranette "Carter" had a valid driver's license. He also requested criminal history checks for both defendants. While awaiting a response from dispatch, Trooper Frederick asked Foster a number of questions relating to the origin, purpose, and destination of defendants' trip. During the course of the conversation, Foster told Trooper Frederick that Wider was a friend of hers. Foster also stated that she and Wider were driving back from Arizona after dropping Foster's daughter off to attend the University of Arizona. Ex. 1 (Frederick videotape) at 22:34-38.

In response to Trooper Frederick's questions, Foster stated that she could not remember when the truck was rented but indicated it had been rented in Wider's name.  Foster said that she currently lives in Wisconsin, and prior to going to Arizona for school, her daughter lived in Wisconsin as well.  However, Foster could not recall the name of the city in Arizona where her daughter currently lived, or what subject her daughter was studying in college.  Ex. 1 (Frederick videotape) at 22:40-45. Trooper Frederick asked why the defendants rented the truck in Omaha when both Foster and her daughter lived in Wisconsin. Foster explained that her sister lived in Nebraska and that some of her daughter's belongings were located at her sister's house. Ex. 1 (Frederick videotape) at 22:44.  Foster also indicated that they opted to drive the rental truck back from Arizona because she was afraid to fly.

As of 10:45 p.m., dispatch had not yet responded to Trooper Frederick's request for information.  The officer called dispatch again.  He again asked Foster whether she had a license.  She said she did and stated that Wider had one as well.  Foster said that she knew she passed the scale without stopping, but that she didn't believe she was required to weigh.  At approximately 10:46 p.m., dispatch advised Trooper Frederick that Foster did not have a valid operator's license and that she had a different last name than the one provided.  In response to followup questioning, Defendant Foster explained that she was going through a divorce and implied that she had not legally returned to using her maiden name.  Ex. 1 (Frederick videotape) at 22:52.  Dispatch also indicated that Wider's operator's license was valid, but he had a significant criminal history involving both weapons and drug charges.

5

Trooper Robert Pelster, who was assigned to patrol Interstate 80 on June 2, 2006, had arrived at the scene to assist Trooper Frederick at approximately 10:40 p.m. He exited his patrol car to speak with Trooper Frederick at 10:48 p.m., and while Trooper Frederick continued questioning Foster in his patrol car, Trooper Pelster spoke with Wider. Wider repeated the story he told Trooper Frederick. Wider stated they were coming from Denver where they had moved his sister. Trooper Pelster asked Wider why they did not fly back to Omaha from Denver. Wider explained that it would be less expensive to drive the truck round trip than fly back one-way. Trooper Pelster asked Wider about his prior criminal history and confirmed that he had numerous violations. During the course of his conversation with Wider, Trooper Pelster noted that Wider was smoking and the cab of the vehicle was full of smoke. He also saw three visible cell phones in the cab of the truck, one of which was located on Wider's lap.

While Foster was still seated inside the patrol vehicle, Trooper Frederick issued Foster a citation for driving without a license and instructed her that Wider would be required to drive the vehicle from that point. Trooper Frederick asked Foster to sign the ticket and explained that she would need to appear in court by July 11, 2007. At approximately 11:08 p.m., Foster began exiting the patrol car to return to the rental truck. Before Foster reached the rental truck, Trooper Frederick asked if he could ask her a few more questions. Foster responded that she was "really tired."

Trooper Pelster exited his vehicle and joined Trooper Frederick as he spoke with Foster. Trooper Frederick proceeded to ask Foster whether she had anything in the cargo area of the

6

rental truck.  She did not respond.  The troopers asked for consent to search the vehicle.  Trooper Pelster explained that the officers suspected criminal activity.  Foster responded by indicating she could not consent to the search because she was not responsible for the truck and that they should ask Wider.

Trooper Pelster approached Wider, who was still seated in the passenger seat of the rental truck, and asked Wider to exit his vehicle.  Trooper Pelster conducted a weapons pat down search of Wider and found a large amount of money but no weapons on his person.  Ex. 5 (Pelster report), p. 2.  Trooper Pelster told Wider that the troopers suspected criminal activity and requested consent to search the vehicle.  Wider declined consent.

Trooper Pelster informed Wider that a canine unit would be called to the scene to conduct an external sniff of the rental truck for the odor of narcotics, and told Wider and Foster to remain at the scene until the canine arrived and the sniff was completed.  Ex. 5 (Pelster report), p. 2.  Wider and Foster were escorted to and seated in Trooper Frederick's patrol vehicle. Ex. 4 (Frederick report), p. 3.

Immediately thereafter, Trooper Pelster summoned the canine unit to conduct the sniff of the rental truck.  Ex. 6 (K-9 Deployment report).  Trooper Downing, who was located at the Waverly weigh station, was the closest canine unit on duty.  He arrived at the scene at 11:22 p.m., approximately seven minutes after Wider denied consent to search the vehicle.  Ex. 6 (K-9 Deployment report); Ex. 3 (Frederick report), p.3.[3]   The canine

---

[3]The precise times on the in-car camera videotapes and described in the officer's reports are not entirely synchronized. The undersigned notes, however, that for the most time-sensitive

7

sniff was promptly initiated and the dog positively alerted to the odor of narcotics at 11:24 p.m.  Ex. 6 (K-9 Deployment report).  A probable cause search was then conducted which revealed twenty-nine bundles of marijuana at the rear of the truck concealed underneath blankets.  Ex. 4 (Frederick report), p. 3.  Defendants Foster and Wider were immediately placed under arrest.  Ex. 4 (Frederick report), p. 3.

## LEGAL ANALYSIS

The defendants claim Trooper Frederick violated the Fourth Amendment by conducting an unlawful traffic stop.  Initiating a traffic stop is lawful "where the police have probable cause to believe that a traffic violation has occurred."  Whren v. United States, 517 U.S. 806, 810 (1996).  Any traffic violation, no matter how minor, provides a police officer with probable cause to stop the vehicle.  United States v. Fuse, 391 F.3d 924, 927 (8th Cir. 2004); United States v. Herrera-Martinez, 354 F.3d 932, 934 (8th Cir. 2004); United States v. Linkous, 285 F.3d 716, 719 (8th Cir. 2002); United States v. Alcantar, 271 F.3d 731, 736 (8th Cir. 2001).  "Courts are not to consider the motive for a stop as long as the reason for the stop is valid."  United States v. Jones, 275 F.3d 673, 680 (8th Cir. 2001).  Although a traffic stop cannot be pretextual, "so long as the officer is doing nothing more than he is legally permitted and objectively authorized to do, his actual state of mind is irrelevant for

---

issues raised by this motion to suppress, the videotape from Trooper Pelster's patrol vehicle, (Exhibit 2), most closely aligns with the K-9 officer's report.  Ex. 9 (K-9 Deployment report).  Accordingly, the times set forth in this report and recommendation are approximations derived from those two sources, with approximate time spans provided by Trooper Frederick's report.  Ex. 3 (Frederick report).

purposes of determining the lawfulness of the stop." <u>Alcantar</u>, 271 F.3d at 736. See also <u>Whren</u>, 517 U.S. at 812; <u>United States v. Bell</u>, 86 F.3d 820, 822 (8th Cir. 1996). Police officers must be able to point to specific and articulable facts warranting the traffic stop. <u>Fuse</u>, 391 F.3d at 927.

Nebraska law provides:

> The driver of any motor truck, truck-tractor, semitrailer, trailer, or towed vehicle who fails to obey any sign, message board, or in-cab signal from any state weighing station or portable scale or who knowingly passes or bypasses any state weighing station or portable scale, when the station or scale is open and being operated by an officer of the Nebraska State Patrol, is guilty of a Class III misdemeanor.

Neb. Rev. Stat. §60-1308. Trooper Frederick initiated a traffic stop when defendants' vehicle failed to stop at the weigh station. The defendants contend, however that this traffic stop was illegal because Foster did not knowingly bypass the state weigh station. The defendants submit (1) that they were unaware that the rental truck was designated within the class "motor truck" thus requiring them to exit and weigh; and (2) that the government has failed to meet its burden of establishing that the signs were working properly on the evening of June 2, 2006.

On the night of June 2, 2006, the weigh station signs were operating properly and were manually set to "all trucks must exit." Foster did not exit the interstate and enter the weigh station as directed by the weigh station sign. When the picture of Foster's vehicle was displayed on the weigh station in-office monitor and Trooper Frederick observed the rental truck proceed past the weighing station without stopping, he was justified in

9

initiating a traffic stop of the vehicle for violating Neb. Rev. Stat. §60-1308.

The defendants claim their rental truck was not a "motor truck" and therefore not required to stop at a Nebraska weigh station. They have cited no Nebraska case law in support of this interpretation of Neb. Rev. Stat. § 60-1308, and the court has found none. Even assuming their statutory determination is ultimately adopted by a Nebraska appellate court, I find the traffic stop of defendants' vehicle on June 2, 2006 did not violate the Fourth Amendment. The determinative question is not whether defendants actually violated Nebraska law, but whether an objectively reasonable police officer could have formed a reasonable belief that a violation occurred. <u>United States v. Martin</u>, 411 F.3d 998 (8th Cir. 2005) (citations omitted). See also <u>United States v. Smart</u>, 393 F.3d 767, 770 (8th Cir. 2005). Even if Trooper Frederick was mistaken in law or fact about the existence of a violation, he had an objectively reasonable belief that a Budget rental truck was a "motor truck" required to stop as directed by the weigh station sign. Trooper Frederick did not violate the defendants' rights by initiating a traffic stop.

After stopping a vehicle, the trooper may lawfully ask any questions reasonably related to the stop, which typically include asking for the driver's license and registration, requesting the driver to sit in the patrol car, and asking the driver about the origin, destination, and purpose of his trip. <u>United States. v. Ramos</u>, 42 F.3d 1160, 1163 (8th Cir. 1994) (citing <u>United States v. Barahona</u>, 990 F.2d 412, 416 (8th Cir. 1993); <u>United States v. Richards</u>, 967 F.2d 1189, 1192-93 (8th Cir. 1992)). An officer may detain vehicle occupants while he performs the somewhat time-consuming but routine tasks of writing a citation, and completing

10

computerized checks of a driver's license, vehicle registration, and criminal histories of the vehicle occupants. Fuse, 391 F.3d at 927; United States v. White, 81 F.3d 775 (8th Cir. 1996). Moreover, an officer does not violate the Fourth Amendment by speaking with the driver and passenger, and asking both of them questions about their trip plans. See e.g. United States v. Allegree, 175 F.3d 648, 650 (8th Cir. 1999)(holding the Fourth Amendment was not violated where the sheriff separately questioned the driver and passenger and developed reasonable suspicion of criminal activity based on the divergence in their answers).

"If an officer's suspicions are aroused in the course of such an investigation, the officer is entitled to expand the scope of the stop to ask questions unrelated to the original traffic offense. . . ." Allegree, 175 F.3d at 650. "[T]he line that separates a traffic stop from an investigative stop is generally difficult to draw and artificial." United States v. Long, 320 F.3d 795, 801 (8th Cir. 2003). "[A]n investigative stop can grow out of a traffic stop so long as the officer has reasonable suspicion to expand his investigation, even if his suspicions are unrelated to the traffic offense that served as the basis for the stop." Long, 320 F.3d at 800.

The defendants claim that they were unlawfully detained following the stop because Trooper Frederick lacked reasonable suspicion to believe criminal activity was afoot. The following facts were uncovered by the troopers during the course of this traffic stop and before Trooper Frederick issued a citation to Foster for driving without a license:

- The defendants' stories regarding the purpose, origin, and destination of their trip were highly inconsistent;

11

- multiple cell phones, which are often provided to drug couriers to facilitate contact with the drug supplier, were located in the rental truck;

- Wider had an extensive criminal history involving drug and weapons charges;

- Foster lied about having a valid operator's license, gave Trooper Frederick the wrong name, stated she did not know who rented the truck or when it had been rented, and claimed she did not know the name of the city where her daughter was now living or her area of college study; and

- The person who actually rented the Budget rental truck was not present.

Although each of these factors alone "is susceptible of innocent explanation, and some factors are more probative than others," a "determination that reasonable suspicion exists . . . need not rule out the possibility of innocent conduct." United States v. Arvizu, 534 U.S. 266, 277 (2002).  "In evaluating whether a set of facts would give rise to reasonable suspicion, this court must look at the totality of the circumstances and not just each independent fact standing alone.  Furthermore, the court may consider any added meaning that certain conduct might suggest to experienced officers in the field, trained in the observation of criminal activity."  United States v. Jones, 269 F.3d 919, 926-927 (8th Cir. 2001).  Based on the totality of facts discovered by the officers during this traffic stop, I conclude the officers had a reasonable articulable suspicion to justify detaining the defendants after the traffic stop itself was concluded, to await the arrival of a drug dog, so long as the length of detention was not unreasonable. United States v. Pulliam, 265 F.3d 736, 740 (8th Cir. 2001)(inconsistencies in information regarding the trip and the relationship between the

driver and passenger justified further detention of the driver while the officer continued to investigate).

The drug dog arrived at the scene of the traffic stop and alerted to the odor of marijuana within the rental vehicle approximately twenty minutes after defendant Foster was cited for driving without a license, and within ten minutes after both defendants refused to consent to a search of the vehicle. The length of this detention was not unreasonable and did not violate the Fourth Amendment. See e.g. <u>United States v. White</u>, 42 F.3d 457, 460 (8th Cir. 1994)(finding delay of one hour and twenty minutes for arrival of drug dog reasonable); <u>Bloomfield</u>, 40 F.3d at 916-17 (one hour wait from time of stop to arrest, part of which was waiting for a drug dog, was reasonable).

Citing <u>Illinois v. Caballes</u>, 543 U.S. 405, 407 (2005) and <u>United States v. Alexander</u>, 448 F.3d 1014 (8th Cir. 2006), the defendants claim their detention following the traffic stop was not *de minimus*, and therefore unreasonably prolonged the traffic stop in violation of the Fourth Amendment. The defendants' reliance on <u>Caballes</u> and <u>Alexander</u> is misplaced. In <u>Caballes</u>, the Court addressed the question of whether, in the absence of any reasonable, articulable suspicion of on-going criminal activity, motorists can constitutionally be detained following the conclusion of a legitimate traffic to allow a drug-detection dog to sniff a vehicle. <u>Cabellas</u> explicitly narrowed its holding to apply to cases where reasonable suspicion was lacking, opting instead to "proceed on the assumption that the officer conducting the dog sniff had no information about respondent except that he had been stopped for [a traffic violation, and] omitted any reference to facts about respondent that might have triggered a modicum of suspicion." <u>Illinois v. Cabellas</u>, 543 U.S. 405, 407

(2005). Relying on Cabellas, Alexander held that even in the absence of reasonable suspicion justifying further detention of motorists, a four-minute detention between the conclusion of a traffic stop and a drug dog's alert was a *de minimis* detention and thus, constitutionally permissible.[4]

Neither Cabellas nor Alexander hold that an officer cannot detain a motorist for a reasonable period of time while awaiting the arrival of a drug dog when, as in this case, the officers have reasonable, articulable suspicion that the defendants are involved in ongoing criminal activity.

IT THEREFORE HEREBY IS RECOMMENDED to the Honorable Richard G. Kopf, United States District Judge, pursuant to 28 U.S.C. §636(b)(1)(B), that the defendants' motions to suppress, filings 38 and 43, be denied in all respects.

The parties are notified that a failure to object to this recommendation in accordance with the local rules of practice may be held to be a waiver of any right to appeal the district judge's adoption of this recommendation.

IT IS FURTHER HEREBY ORDERED: Trial is set for 9:00 a.m. on May 7, 2007 for a duration of three trial days before the Honorable Richard G. Kopf. Jury selection will be at the commencement of trial.

DATED this 22nd day of February, 2007.

BY THE COURT:

s/ *David L. Piester*
David L. Piester
United States Magistrate Judge

---

[4]I note that the delay between denying consent and the alert by a drug dog at the scene of this traffic stop was approximately seven minutes. I need not reach but nonetheless note that it is certainly arguable this detention did not even violate the *de minimus* standard.